UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/23/19

JEAN M. NEMES and JAMES NEMES,

                                        Plaintiff,

        -against-

DICK'S SPORTING GOODS, INC. and BARNETT
OUTDOORS, LLC,

                                        Defendants.

No. 17-cv-1688 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiffs Jean Nemes ("Mrs. Nemes") and James Nemes ("Mr. Nemes") (together "Plaintiffs") commenced this action on March 8, 2017, asserting products liability claims against Defendants Dick's Sporting Goods, Inc. ("Dick's") and Barnett Outdoors, LLC ("Barnett") (together, "Defendants"). (*See* Complaint, ("Compl."), ECF No. 1.) Plaintiffs raised claims for common law negligence, strict tort liability, and breach of warranty. (*See id.* at 6-7.)

On August 9, 2018, following the close of discovery, the parties stipulated to dismiss Plaintiffs' failure to warn claims, leaving intact Plaintiffs' defective design claims. Presently before the Court are: Plaintiffs' Motions to Preclude Defendants' proposed experts: John V. Grace and Michael Van Durme, (ECF Nos. 56 and 57), and Defendants' Motion to preclude Plaintiff's proposed expert Brian O'Donel. (ECF No. 53.) For the following reasons, Plaintiffs' and Defendants' Motions are GRANTED in part and DENIED in part.

# BACKGROUND

The following facts are derived from the parties' moving papers and are undisputed unless otherwise indicated. They provide general background for the *Daubert* motions at issue.

In November 2016, Mrs. Names was a 64-year old retired school secretary. The previous month, her husband had gifted her a crossbow, a modern bow-and-arrow device known as a Barnett Lady Raptor FX ("Lady Raptor"). A few months before this gifting, Mrs. Nemes began using her husband's crossbow, a Barnett Reverse Raptor ("Reverse Raptor"). She used his Reverse Raptor at least 20-30 times, taking over 100 shots with it, prior to getting her Lady Raptor. Mr. Nemes taught Mrs. Nemes how to use his Reverse Raptor, which he claims had a crossbow rail or ledge below the track where the string travelled.

Mrs. Nemes testified that when she received her Lady Raptor, she read the owner's manual cover to cover and understood all the warnings and instructions in it. She also estimated that she shot the Lady Raptor 250-300 times in the weeks leading up to November 18, 2016 without any problems, including earlier in the day on November 18, 2016. Nevertheless, on the evening of November 18, 2016, Mrs. Nemes injured herself on her twelfth through fifteenth shot of the afternoon. The injury supposedly came about when Mrs. Nemes squeezed the trigger to take a shot and her thumb slid, resulting in the distal half of it being amputated by the bow string.

Mrs. Nemes testified that she was not distracted, did not lose her grip, and did not lose her balance or footing before she was injured. She testified that she was gripping the foregrip of her Lady Raptor with her left hand and that her thumb was below the finger reminder rail. She claims that she does not know why her left thumb got above the finger reminder rail and into the flight track but asserts that she did not change or shift her grip. Mr. Nemes testified that he warned Mrs.

Nemes on several occasions about the importance of keeping her thumb and fingers below the finger reminders. Mrs. Nemes stated that she fully appreciated the risk of having any body part in the flight track or above the finger reminders while using the Lady Raptor.

Plaintiffs claim that the Lady Raptor lacked proper finger guards, which could have created a barrier between the foregrip and the flight track, and blocked Mrs. Nemes's thumb from going into the bow string path. In support of their design defect claim, Plaintiffs submit testimony from Brian O'Donel, a supposed expert. Similarly, to refute her claims, Defendants offer the testimony of their purported experts, John V. Grace and Michael Van Durme.

## LEGAL STANDARD

The testimony of an expert, at trial, must be reliable and relevant. The standards governing the admissibility of expert testimony are set forth in Fed.R.Evid. 702, which provides that "[a] witness...qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if...the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The standards have been further clarified by the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999). In *Daubert*, the Supreme Court defined the role of the district court as that of a gatekeeper charged with the task of deciding whether an expert's scientific testimony satisfies Rule 702's general requirements of reliability and relevance. *Daubert,* 509 U.S. at 597. Originally intended to screen out "junk science," *Daubert* has been extended to both technical and other specialized expert evidence. *See Kumho*, 526 U.S. 137.

In addition to screening whether or not a proposed individual qualifies as an expert as contemplated by Rule 702, the court must assess whether the purported expert's testimony is relevant and reliable to be admissible at trial. In assessing the reliability of potential expert testimony, the court must, "...make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. Hence, the court must focus on the purported expert's principles and methodology, not on the expert's conclusions. Ultimately, admissibility is a question of law that rests within the discretion of the district court. *United States v. Feliciano,* 223 F.3d 102, 120 (2d Cir.2000).

Notably, in December 2000, Rule 702 was amended to reflect the court's gatekeeping task. With regards to assessing expert testimony for admissibility, Rule 702 now instructs district courts to ensure that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. Further, the proponent of the evidence must establish its admissibility by a preponderance of the proof. *See Bourjaily v. United States*, 483 U.S. 171, 175-76, 107 S.Ct. 2775, 2778-79 (1987).

## DISCUSSION

The pending *Daubert* motions pertain to three individuals whom the parties argue are experts. The Court thus segregates its discussion by individual, beginning with Plaintiffs' proposed expert, Brian O'Donel.

4

## I.    Brian O'Donel

O'Donel's background is as follows. O'Donel is a professional engineer, a facilities engineer, and a machinery and machine process safety expert who has been an associate with Robson Forensic, Inc. since 2009. (*See* Pl. Dec., Ex. A, O'Donel C.V, ECF No. 58-1.) At Robson Forensic, he has provided technical investigations, analyses, reports, and testimony towards the resolution of industrial, commercial, and personal injury claims. He has also assisted in litigation involving industrial facilities, manufacturing facilities, equipment and product safely, machine guarding, and premises safety. (*See id*.) Further, he has a bachelor's degree in Science and Mechanical Engineering from Pennsylvania State University, a Six Sigma Black Belt, and certifications in the following OSHA programs: OSHA 30-Hour, OSHA Machine Guarding, and OSHA Trainer. (*Id*.)

O'Donel testified that the Lady Raptor FX crossbow had inadequate thumb guards or barriers to prevent Ms. Nemes's injury. (*See* O'Donel Report ("Report") in Defendants' Dec. in Support of Mot. to Exclude, ("Def. Dec."), Ex. 2 at 2, ECF No. 53-1.) In rendering his opinion, O'Donel reviewed 23 items, which included, *inter alia*: outside depositions, his inspection of the incident crossbow and similar crossbows, a New York State Police Incident Report, Barnett's owner manuals and publications, the Parker Video of Hot Dog Amputation/Demonstration, the Daven Chapa injury video, seven patent applications for crossbow grip guards (with iterations of safety devices that purportedly maintain the fingers of a crossbow operator in a safe position during discharge of the crossbow), a US Consumer Product Safety Commission Report, (which evaluated eleven incidents of people using Barnett crossbows and supposedly suffering thumb lacerations or

amputations when the victim put their thumb in the path of the bowstring), and a Barnett Crossbow Claims Chart of 157 Claims of finger/thumb injuries using Barnett crossbows. (*Id.*)

Defendants seek to exclude O'Donel's opinion that the Barnett Lady Raptor FX lacked an adequate barrier guard and that the inadequate guard caused Ms. Nemes's injury. (Defendants' Memorandum to Exclude Brian O'Donel, ("Def. Mem. to Ex."), ECF No. 53-7.) They argue that "the sum and substance of O'Donel's analysis and testing of his hypothesis consisted of handling the crossbow, observing others handling the crossbow and examining other crossbows." (*Id.* at 4.) They add that "he did no testing or analysis to determine the size or shape that the barrier guard should be to prevent injury." (*Id.* at 9.) And they claim he did not test what he would consider to be the minimum acceptable dimensions for an adequate barrier guard. Thus, they argue, he detrimentally failed to come up with the necessary feasible alternative design. (*Id.* at 3.)

**Analysis**

Federal Rule of Evidence 702 allows the opinion testimony of experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education, [and if] scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue." Fed.R.Evid. 702.

The Court's first step in deciding whether or not to admit expert testimony is to determine whether the proffered expert is qualified by virtue of specialized "knowledge, skill, experience, training, or education.'" *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (quoting Fed.R.Evid. 702). The threshold question is "whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Hillaire v. DeWalt Indus. Tool Co.*, 54 F.Supp.3d 223, 233-34 (E.D.N.Y. 2014); *Lappe v. Honda*

*Motor Co. of Japan*, 101 F.3d 682 (2d Cir. 1996) (noting that expert's skill knowledge, or experience should be sufficient to "*probably* aid the trier of fact in his search for the truth.") (emphasis in original).

In the context of products liability, an expert need not be confined to his area of practice. "Where an expert has the education or background to permit him to analyze a given set of circumstances, 'he can through reading, calculations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not have actual experience in its manufacture.'" *Id.* (quoting *United States v. Viglia*, 549 F.2d 335 (5th Cir. 1977)); *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-cv-4527, 2006 WL 5230033, at *9 (allowing expert to testify, despite expert not possessing experience tailored to the precise product and issue); *Kass v. West Bend Co.*, No. 02-cv-3719, 2004 WL 2475606, at *5 (E.D.N.Y. Nov. 4, 2004) (finding expert qualified where, despite having no experience with consumer products, expert was deemed to have sufficient experience in accident prevention.) In sum, "the total scope of an expert's qualifications should be considered in evaluating whether or not his or her testimony is admissible." *Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 730 (E.D.N.Y. 2016).

**O'Donel's Qualifications**

The Court finds O'Donel's qualifications sufficient to render him an expert. O'Donel is a professional engineer who has focused on industrial, facilities and machine process safety for over two decades. (*See* Pl. Dec., Ex. A, O'Donel C.V.) He has been with Robson Forensic, Inc. alone since 2009, a role in which has been conducting technical and product safety investigations and providing analyses, reports, and data for resolving commercial and personal injury claims and litigation, including related to industrial manufacturing and machine guarding. (*See id.*) Before

that, he was with Veolia ES/Harley-Davidson Motor Company, where he similarly provided technical consulting and managed compliance projects to ensure regulatory compliance for vehicles and motorcycles. (*Id*.)

Prior to his work at Veolia, O'Donel worked for Standard Register Company for ten years, managing their plant engineering, maintenance, emergency response, and environmental compliance. (*Id*.) At Standard Register, he also handled: design, installation, implementation, and maintenance of facility and manufacturing systems; production equipment; machine compliance with OSHA standards; training, manufacturing, and design improvements. (*Id*.) And in the ten years prior to that, O'Donel worked for various companies in roles related to engineering management, research and product development, facilities engineering, project management, and equipment safety improvement. Further, O'Donel has a bachelor's degree in Science and Mechanical Engineering from Pennsylvania State University and certifications in the OSHA 30-Hour, OSHA Machine Guarding, and OSHA Trainer programs (*Id*.)

Given the Court's flexibility in evaluating an individual's qualifications and based on O'Donel's education and three decades of work experience, the Court deems O'Donel an expert in machine and equipment safety.

**Reliability of O'Donel's Testimony**

The Court next turns to the admissibility of O'Donel's testimony. First, it notes that under New York law, to show that a product was not reasonably safe and thus defectively designed, a plaintiff much show that: "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safe manner; and (3) the defective design was a substantial factor in causing plaintiffs injury." *Colon ex rel. Molina v. BIC USA, Inc*., 199 F.Supp.2d 53, 83

*S.D.N.Y. 2001) (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108-09, 463 N.Y.S. 2d 398 (1983)).

In his expert report, O'Donel makes the following findings: (1) the crossbow design exposed the user to the string motion hazard; (2) the combination of hazard and exposure was a dangerous condition that was a cause of Plaintiff's injuries; (3) the injury to plaintiff was foreseeable; (4) Barnett's failure to provide an adequate safeguard was a design defect and was the cause of Plaintiff's injury; (5) as designed the Barnett crossbow presents an unreasonable risk of harm to the user; (6) others in the industry recognize this hazard and provide a means to protect people; (7) Barnett's failure to provide an adequate safeguard deprived Mrs. Nemes of the protection that others in the industry provided and reasonable engineering principles required; and (8) safer alternatives were feasible and available to Barnett and would not have defeated the utility of the product. (Def. Dec. Ex. 2 at 18, O'Donel Expert Report.)

Thus, Plaintiffs seek to admit O'Donel's expert testimony in support of all three elements, whereas Defendants seek to exclude it for these purposes. For reasons discussed below, the Court finds that while O'Donel's expertise and methodology permit him to testify about the first and third elements of a defective design claim, his methodologies are not sufficiently reliable for him to testify about the second element regarding a feasible alternative.

### The Product as Designed Posed a Substantial Likelihood of Harm

Regarding the substantial likelihood of harm element, Defendants continually argue that O'Donel did not conduct any objective, repeatable tests to confirm the size of an adequate barrier guard, such that he can testify that the Lady Raptor was inadequate by industry standards. They argue that the "sum and substance of Mr. O'Donel's analysis and testing of his hypothesis

consisted of handling the crossbow, observing others handling the crossbow, and handling and examining other crossbows." (Def. Mem. to Ex. at 4.)

Plaintiffs, however, argue that Defendants mischaracterize O'Donel's methodology. They claim that not only is the method of handling the crossbow, examining others handling the crossbow, and handling and firing other crossbows sufficient under *Daubert*, but moreover, O'Donel reviewed extensive external materials, which—along with his mechanical background and the relative technical simplicity of this case—are sufficient for him to render an expert opinion about the Lady Raptor's substantial likelihood of harm. (*See* Plaintiff's Memorandum in Opposition, ("Pl. Mem. Opp."), at 6, ECF Nos. 58-5, 59.)

The Court agrees with Plaintiffs. As stated earlier, the testimony of an expert must be both reliable and relevant in order to be admissible at trial. Considerations for assessing reliability and relevance under Rule 702 are:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Further, the Committee Notes for this Rule explain that the purpose of the Rule is to assist the trier of fact when an untrained layman would be unable to intelligently determine a particular issue without a specialized understanding of the subject in the dispute. Lastly, while the Notes recognize the trial court's role in carefully vetting reliability of proffered expert testimony, they also underscore that "rejection of the expert testimony is the exception rather than the rule." Fed.R.Evid. 702 advisory committee's notes.

Here, O'Donel's expert report was generated from both his analysis of data and engaging in "testing methods." The Court must therefore vet both methods. Beginning with the data upon which he relied, the Court finds that O'Donel's data was broadly derived from several sources, including: his inspection of the incident crossbow and similar crossbow's inspections, a New York State Police Incident Report, Barnett's owner manuals and publications, the Parker Video of Hot Dog Amputation/Demonstration, the Daven Chapa injury video, seven patent applications for crossbow grip guards with iterations of safety devices that maintain the fingers of a crossbow operator in a supposedly safe position during discharge of the crossbow, a US Consumer Product Safety Commission Report (which evaluated eleven incidents of people using Barnett crossbows and supposedly suffering thumb lacerations or amputations), and a Barnett Crossbow Claims Chart of 157 Claims of injuries resulting from Barnett crossbows (some cases of which he himself participated in as an expert). (Def. Dec. Ex. 2, at 2, ECF No. 53-1.)

In arriving at his conclusion that the Lady Raptor lacked an adequate guard, which posed a substantial likelihood of harm, (*id*. at 2), O'Donel first discussed his personal "inspection of the subject crossbow" that supposedly "showed that it is difficult if not impossible to see your fingers while aiming through the scope." (*Id*. at 4.) O'Donel also relied on the testimony of Daniel Davis, a former Barnett Engineering Manager, who testified elsewhere that "as you are shooting a Barnett crossbow, and you're looking through the scope, you cannot see where your fingers and thumb are placed." (*Id*. at 4-5.) This was reiterated by David Barnett of Barnett, who had previously testified that: "you wouldn't see your thumb because you are focused on looking through the scope" and "if you put your hand in front of [the string], you're going to get hurt." (*Id*. at 5.)

O'Donel applied his testing of the Lady Raptor and testimony about Barnett crossbows from Daniel Davis and David Barnett to the prevailing industry standards, which he derived from: *Product Safety Management Guidelines* by the National Safety Council, the *Handbook for Manufacturing Safer Consumer Products* published in 2006 by the United States Consumer Products Safety Commission ("CPSC"), the *Handbook for Manufacturing Safer Consumer Products*, the *Product Safety Management Guidelines* by the National Safety Council, and the *Product Safety Engineering for Managers, A Practical Handbook and Guide*. (*Id*. at 8.)

The US Consumer Products Safety Commission is an independent federal agency specifically tasked with protecting the public against unreasonable risks of injuries and deaths associated with consumer products. *See* United States Consumer Product Safety Commission, http://www.cpsc.gov/About-CPSC/. Similarly, the National Safety Council has been chartered by Congress with the same purpose. *See* About the National Safety Council, http://www.nsc.org./company. Accordingly, the Court finds it appropriate that O'Donel applied the facts of this case to the standards promulgated by these credible agencies.[1]

Based on O'Donel's sources of data, experience, and testing of the Lady Raptor, the Court finds that O'Donel has used sufficiently reliable methods to assist a trier of fact with deciding whether the Lady Raptor, as designed, posed a substantial likelihood of harm to a user. *See Almonte v. Averna Vision & Robotics, Inc*., 128 F. Supp. 3d 729 (W.D.N.Y. 2015) (allowing expert to testify about the lack of guarding on a conveyor that caused plaintiff injury, where expert's testimony of

---

[1] The Court notes that the cases in which reports by the US Consumer Product Safety Commission were deemed unreliable were cases in which the expert relied on the agency reports for proof *of the design flaw*, not for the appropriate standards for safety design and manufacturing defects. *See e.g.*, *Hilaire v. DeWalt Indus. Tool Co*., 54 F. Supp. 3d 223 (E.D.N.Y. 2014). The difference is material.

such was based on his application of the American Society of Mechanical Engineers' recognized industry standards); *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc*., 594 F. Supp. 2d 230 (N.D.N.Y. 2009) (permitting expert to testify about his interpretation of the applicable safety standards of the American National Standards Institute based on his education, professional background, and secondary data sources, but not allowing him to testify about feasibility of alternative designs that he had never created or tested).

### Feasibility to Design the Product in a Safe Manner

The Court next turns to whether O'Donel may testify about whether it was feasible for Barnett to design a safer crossbow with an adequate safety barrier. In products liability cases, "the 'touchstone' of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs." *Lara*, 174 F.Supp.3d at 736 (quoting *Hilaire v. DeWalt Indus. Tool Co*., 54 F. Supp. 3d 223, 244) ("In order to prove liability grounded upon a design defect, New York law requires plaintiffs to proffer expert testimony as to the feasibility and efficacy of alternative designs.") "The presence of this factor in a design defect case also ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." *Colon ex rel. v. Molina v. BIC USA, Inc*., 199 F.Supp.2d 53, 77 (S.D.N.Y. 2001).

O'Donel's report reflects that a safer alternative design for the crossbow was feasible and that others in the industry had incorporated such designs. (*See* Report, Def. Dec. Ex 2, at 9):

> The safeguarding of motion hazards by manufacturers was certainly not a new concept when these crossbows were released to the market. The concept of barrier guards to prevent inadvertent contact with a hazard has been known to product engineers and manufacturers of products and the consumer products industry for decades. Any claim of "state of the art" with regard to the inadequately guarded design is completely without merit. Claims that the type of guard that would have

13

prevented these hand injuries was not available until 2011 ignores the simplicity of the barrier guards in question. Further, the use of barrier guards for this type of risk prevention has been common for decades prior to the manufacture of the crossbow in question. There was no technological barrier to Barnett properly safeguarding against the risk, they simply failed to do so.

But for all of O'Donel's strong opinions, the Court struggles to find the foundation of their reliability. Because Plaintiffs emphasize the breadth of sources that O'Donel analyzed as support for the reliability of his opinions, the Court goes through each and shows why they still do not allow O'Donel to testify on the element of feasibility.

First, the Report cites a June 2007 *Whitetail Journal* article, which apparently stated that certain competitor crossbow manufacturers had installed a thumb safety device and changed the design of the crossbow forearm to prevent hunters from being able to get their fingers or thumb above the rail of the bow. (*Id.* at 5.) Notably, however, O'Donel's report did not elaborate as to which competitor manufacturers had installed these supposedly adequate devices. Nor did he provide any useful details as to the competitor safety devices' specifics, such as whether they were on similar types of crossbows, of similar sizes and prices, and/or whether they could have also been used on the Lady Raptor. His deposition, too, provided minimal additional insight. Thus, while the article supposedly refers to other devices having better finger protection contraptions, its lack of specificity and indicia of credibility fail to bolster the reliability of O'Donel's opinion that it was feasible and/or germane to the industry for adequate finger barriers to be used.

Next, O'Donel's report states that at least as early as 2006, there were patents describing features to protect crossbow operators from inadvertent contact with the string motion hazard. (*Id.* at 9.) For example, he references a Ten Point patent filed in 2009 that described a crossbow grip guard. (*Id.*) The references to the patents in his report, as well as the other patent applications he

claims to have reviewed, do not prove that these devices were actually manufactured and sold. Thus, they do not show that there was a feasible alternative device on the market. *See e.g., Hilaire*, 54 F. Supp. 3d at 244 (E.D.N.Y. 2014) (finding expert's conclusions on availability of alternative designs and technology insufficient where expert had not: tested the designs, proven that they were employed on the type of device that caused the plaintiff's injury, nor done analysis of the feasibility or cost of installing those alternatives, particularly relative to the utility of the device). Indeed, in his deposition, O'Donel mentioned owning a Ten Point crossbow and having to design his own device to ensure finger protection. (*See* O'Donel Dep. in Blankenship v. Barnett, Ex. 4, at 121-24, ECF No. 53-1.) This further suggests that feasible design alternatives were not already in use.

Moreover, as Defendants note, patent applications themselves do not demonstrate that *the Lady Raptor* lacked an adequate finger barrier or that the devices patented could have been used *on* the Lady Raptor. In that regard, Defendants are correct that this case differs from the situation in *Almonte*, 128 F. Supp. 3d 729, in which after the injury occurred, the employer retrofitted the subject machine with a guard to prevent the injury plaintiff suffered from happening in the future, and plaintiff's expert opined that the new guard was an alternative feasible design. *Id*. at 751. Here, Barnett did not change its barrier after Mrs. Nemes's injury. Nor did O'Donel conduct any meaningful testing for a plausible alternative on the actual Lady Raptor. Thus, while he references testimony of Daniel Davis, Barnett's former Engineering Manager, reflecting that "finger reminders" were brought to Barnett's attention and that Davis had seen and researched "a Ten Point with the finger guards," (Report, at 9), such testimony fails to demonstrate a problem with the Lady Raptor model specifically. It also fails to show that Barnett engaged in any actual testing or found a plausible solution to the issue with the Lady Raptor or similar devices.

Towards the very end of the report, O'Donel repeats that "Nemes's Barnett Lady Raptor did not have an adequate barrier guard." And he adds that "Barnett crossbows were equipped with a poorly designed, inadequate, and ineffective thumb/finger guard… [which was] inadequate for its intended purpose as a barrier guard." (*Id*. at 16.) In this section of the report, entitled "Safer alternatives were feasible and available at the time of manufacture," O'Donel provides a photograph of him holding the Lady Raptor to show the finger's exposure as well as a photo of a competitor model, the Ravin crossbow with "2+ inch barrier guards" and a "Bear crossbow with guarding features, Gearhead with vertical grip protection." (*Id*. at 17-18.)

In this section, the first photo shows how the design of the Lady Raptor and hand-positioning creates a substantial likelihood of harm to the thumb, and indeed, one that could have caused Mrs. Nemes's injury. (*Id*.) But none of the photographs show that there was a feasible alternative. The photos of the Bear and Ravin have several flaws. First, they do not show O'Donel similarly holding them in a manner that makes it clear that they were designed with similar dimensions to the Lady Raptor and would pose the same risk of harm to a person holding them. In fact, a general look at the Bear and Ravin photos makes it seem as though those two models have a distinctly different crossbow shapes than the Lady Raptor altogether.

The Court notes, however, that O'Donel could still use those models to support his opinion if he demonstrated that the physical differences between the models was minor and that: 1 ) they had adequate barrier guards, 2) such barrier guards could have been implemented in the Lady Raptor with minimal cost burden to Barnett, and 3) such guards could have prevented Mrs. Nemes's injury without diminishing the Lady Raptor's utility. O'Donel's photographs simply do not go this far. The photos do not show what, if any, superior guards were in place, and nor do

they elaborate on how those guards could have been supplanted into the Lady Raptor, at low or reasonable cost, and without diminishing its utility. Indeed, his Report does not belabor the improvements of those models or do any in-depth comparison between them. Thus, at best, with the photos of the alternative models, O'Donel merely speculates about their hypothetical superiority.

The Court finds similar flaws with O'Donel's reliance on the Parker Video and video of Daven Chapa. Neither of these videos features a Lady Raptor, and thus the flaws depicted in these videos do not support the proposition that O'Donel adequately tested the flaws and feasibility of alternative solutions for the Lady Raptor. *See Brooks v. Outboard Marine Corp*., 234 F.3d 89 (2d Cir. 2000) (noting that expert "had not performed any tests on the actual boat or engine involved in the accident, conducted any interviews with any witnesses, or conducted 'any actual testing…'" of his proposed design solution).

Similarly, both the Report from the US CPSC and the Barnett Crossbow Claims Chart fail to specifically show similar injuries to Mrs. Nemes being caused by the Lady Raptor. The Barnett Crossbow Claims chart only lists one claim that even relates to a "Raptor" model, let alone a Lady Raptor, and there is no specific information about this claim in the chart. Therefore, it is unclear what the claim or injury in that chart is about. Again, none of these four sources meaningfully moves the needle towards proving that O'Donel's contention as to feasible alternatives to the Lady Raptor structure existed and were already being manufactured with improved results. Accordingly, they support O'Donel's testimony being little more than the "theoretical musings" or "guesswork" that the *Lara* court warned against admitting. *Lara*, 174 F.Supp.3d at 736.

But even assuming that O'Donel identified plausible superior guards in comparators, the Court finds that O'Donel's claim, that alternatives were available and feasible to Barnett and would not have defeated the utility of the product, lacks adequate testing. In his deposition, O'Donel claimed that he thoroughly measured and tested the Lady Raptor at issue, that others also tested it, and that he and his team tested other devices. (*See* O'Donel Dep., Def. Dec. Ex. 2, at 9-15.) But the nature of all this measuring and testing again support the first and third elements for a design defect claim. They do not truly address the feasible alternative prong, which needs proof that it was mechanically possible to better design the defective product and that the cost/benefit analysis warranted so doing.

Indeed, in O'Donel's report, O'Donel referenced testimony of Daniel Davis (Barnett's former Engineering Manager), who reported that there is an innate harm that crossbows pose to fingers, one that is "inherent to every crossbow." (Report, at 5.) In his deposition, O'Donel reiterated that Davis had testified that Barnett was unable to design the Lady Raptor in a manner to avoid this vulnerability. (*See* O'Donel Dep. at 37:5-14.) Thus, O'Donel's methods again underscore that the Lady Raptor was innately dangerous and likely caused Mrs. Nemes's harm, but not that it was feasible to avoid the harm.

Lastly, when specifically grilled about what testing O'Donel may have done regarding alternative solutions for the lack of a finger barrier, O'Donel repeatedly emphasized that he basically measured, photographed, evaluated, and compared a few models on the market. (*Id.* at 9-13.) He also mentioned watching a video of Mrs. Nemes's reenacting how she shot the Lady Raptor. (*Id.* at 22.) In a similar older deposition for another lawsuit, he even discussed trying to design a better guard on his own crossbow. But nowhere in any of his old depositions, did O'Donel

testify that he was able to test the Lady Raptor or highly similar crossbow models that had adequate barriers and eliminate the innate risk of finger harm. Nor was he able to design a contraption that could be generically affixed to the Lady Raptor and eliminate such risk altogether.

Accordingly, even though O'Donel's methods were not as woefully ineffective as the experts in *Brooks*, 234 F.3d 89 (finding that expert had not seen nor conducted any tests on the actual boat or engine involved in the accident) , *Lara*, 174 F.Supp. 3d 719 (finding that expert performed no meaningful tests or calculations, prepared no drawings of a proposed alternative design and conducted no meaningful comparisons) or *Zaremba*, 360 F.3d 355 (finding expert had not tested, measured, prototyped, calculated, submitted alternative designs for peer evaluation, or provided proof of comparators), they were still insufficient to pass muster under Rule 702.

The situation here is akin to that in *Hilaire*, 54 F.Supp.3d 223, where the expert prepared a detailed report and had substantial qualifications. There, as here, the Court found most of the report to be filled with principles related to mechanical safety with only sparse actual opinions and conclusions on the defective device. Further, when that report contended that there were feasible mechanical alternatives, it only mentioned such conclusions in generalities, without sufficient detail regarding structure, cost, or industrial time frame. *Id*. at 244 ("Mr. Barbe's conclusions concerning alternative designs are similarly without analysis or support. He asserts, for example, that 'if a guard is placed at the point of operation on the Saw, the dangers of coming in contact with its moving parts will be eliminated'—an assertion that seems self-evidence based solely on commons sense.") Indeed, the *Hilaire* Court repeatedly emphasized that the expert had not shown that his proposed devices had ever been tested or used with the type of saw at issue, let alone that it was economically feasible and worthwhile for them to be so utilized.

The instant situation is also comparable to *Lara*, insofar as the *Lara* Court's issue with the expert not doing a meaningful comparison of the cost versus utility of the alternative design theory. Here, O'Donel opined that the Lady Raptor's finger barrier had an easy design fix that would cost Barnett nearly nothing and not reduce the utility of the device, yet he did not have reliable data to back his opinion. Such speculation is simply insufficient to support a design defect theory, even if seemingly common sense. Therefore, O'Donel may not testify about a feasible alternative.

**Causation**

The Court turns lastly to whether O'Donel may testify about the element of causation. The Court finds that O'Donel does have the sufficient expertise and adequately vetted methods to do so. It already found that his sources of information were vast and reliable enough for him to opine on whether the Lady Raptor posed a substantial likelihood of harm. Further, his physical testing of the Lady Raptor, as it is currently designed, and comparison with other models, as they are currently designed, are reliable testing methods for proving causation for a relatively simple device. In conjunction with the amputation videos, patent applications, and reports of consumer injuries, as well as Daniel Davis's and David Barnett's concessions regarding the likely risk of harm, O'Donel's testing methods are sufficient for him to opine that the Lady Raptor's design was a foreseeable cause of Mrs. Nemes's finger injury. *See Almonte,* 128 F.Supp. at 748.

Having addressed Defendant's Motion to Exclude Plaintiffs' expert, and its decision to grant in part and deny in part the motion, the Court turns to Plaintiffs' Motion to deny Defendants proposed experts. Similar to its analysis of O'Donel, the Court begins by assessing their expert qualifications and then concludes by discussing the reliability of their proposed testimony.

## II.     John V. Grace's Expert Status

Grace's background is as follows. Grace has been involved with crossbow sales since 1989 as a retailer, and in crossbow design as a manufacturer since 2003. (Def. Dec. in Opp., Ex. 1, ECF No. 60-1.) He has designed or helped design crossbows for the consumer market under two different brands. (*Id*.) He has written owner's manuals for safe crossbow use and has instructed hundreds of individuals how to safety use a crossbow. (*Id*.) He has also testified in several cases, related to trademark and personal injury issues. (*Id*.)

While Defendants have not provided as much detail about their experts' backgrounds as did Plaintiffs, the Court still finds Grace's background sufficiently robust for him to testify as an expert in this case. Again, the threshold question when assessing an expert's knowledge, skill, experience, training and/or education is "whether the expert's knowledge of the subject is such that his opinion will *likely assist* the trier of fact in arriving at the truth." *Hillaire*, 54 F.Supp.3d at 233-34 (emphases added); *Lappe v. Honda*, 101 F.3d 682 (noting that expert's skill knowledge, or experience should be sufficient to "*probably* aid the trier of fact in his search for the truth.") (emphasis in original). Here, Grace's background would likely assist the trier of fact in ascertaining the truth. Accordingly, it suffices.

## III.     Michael Van Durme's Expert Status

Van Durme's background is as follows. Van Durme is a retired New York Environmental Conservation Police Captain. (Def. Dec. in Opp. Ex. 8, ECF No. 60-8.) He has been investigating and teaching about the investigation of hunting and shooting-related accidents and injuries for over 20 years. (*Id*.) He serves as the Director of the International Hunter Education Association (IHEA) Hunting Incident Investigation Academy, where he taught for over 15 years. (*Id*.) He has been a

Certified Hunter Education Instructor for over 33 years, teaching about the safe use and handling of firearms, bows and crossbows. (*Id.*)

He is also a life member of the IHEA and regularly attends its national conferences, where he learns about the methods and materials that are used in all the states and provinces. (*Id.*) He has also been hunting and shooting for over 45 years, using a wide variety of firearms, bows, and crossbows. (*Id.*) As a consultant, he has been asked to review and update the training materials that are used in Hunter Education classes across the country. (*Id.*) He has been researching and studying crossbows and crossbow designs for over 15 years, including meeting with factory representatives of every major manufacturer and handling and shooting crossbows from all the leading manufacturers. (*Id.*) His interest has focused on evolving designs, the safe use of crossbows, and how to train users to avoid any risks. (*Id.*)

In addition, Van Durme testified that he has a degree from SUNY Cobleskill in Applied Science, Fisheries and Wildlife. (Def. Dec., Ex. 3, Van Durme Dep. at 26, ECF No. 60). He also testified that while working for the New York State Department of Environmental Conservation as a consultant, one of his specialties was running a hunting accident investigation program. In this program, he testified that he developed the Department's training and a piece of equipment/database that they use for injury investigations. (*Id.* at 29.) At the same time, Van Durme testified that he does not have an engineering background, and nor has he ever designed a crossbow or components of a crossbow, including barrier guards of any type. (*Id.* at 43.)

The Court finds Van Durme's skills, qualifications, and work experience amply support his being an expert witness. Accordingly, it deems him an expert and moves on to assess the reliability of both his and Grace's proffered testimony.

## IV.     Lack of Reliability

Having determined that Grace and Van Durme are both qualified to testify as experts, the Court examines whether their proffered testimony qualifies as specialized knowledge sufficient to assist the trier of fact in understanding the evidence or determine a fact in issue. Again, under *Daubert*, expert testimony is admissible under Rules 702 of the Federal Rules of Evidence if it is both relevant and reliable. *See Daubert*, 509 U.S. at 589-90.

Both Grace's and Van Durme's testimony that Defendants seek to admit only relates to causation. Specifically, Defendants seek to admit Grace's testimony that "Mrs. Nemes was the sole cause of her injuries." (Def. Dec. in Opp. at 10.) And similarly, they seek to admit Van Durme's testimony that "Jean Nemes was the sole cause of her injuries." (*Id*.) The issue of causation is undoubtedly relevant as it is one of the *prima facie* elements for a defective design claim. Therefore, the only issue for this Court to assess is reliability.

Defendants have failed to show that Grace's or Van Durme's testimony that Mrs. Nemes caused her injuries was based on sufficient facts or data, the product of reliable principles and methods, and that such methods were reliably applied to this case, as is required by Fed.R.Evid. 702. Defendants try to skirmish this requirement by arguing that it is Plaintiffs' burden "to present evidence that it was feasible to design the product in a safe manner." (Def. Dec. in Opp. at 9.) They add that because Plaintiffs have not met their burden, Plaintiffs attempt to charge Barnett's experts with the responsibility of testing their purported alternative design. (*Id*.)

The Court finds this argument incredible. Plaintiffs challenge the very issue with Defendants' experts that Defendants challenge with Plaintiffs' expert. The appropriate thing to challenge on a *Daubert* motion is the method an expert used to arrive at his or her opinion,

regardless of whose ultimate burden it is to make out the elements for a *prima facie* claim. Here, while both experts are qualified to offer expertise, they did not engage in any of the testing methods that the law requires for some of their testimony to be admissible. That Defendants do not have the burden of disproving a feasible alternative is of no import. Defendants seek to admit certain testimony of supposed experts to refute Plaintiffs' causation argument. To do so, their methods must be sufficiently reliable. *See Brooks*, 234 F.3d 89 (finding that the "failure to test a theory of causation" justified the trial court's exclusion of the expert's testimony).

**Grace's Methodology**

With Grace specifically, while he has worked in the crossbow industry since 1989, selling and designing crossbows for various manufacturers, his report contained a mix of opinions about crossbows generally and factual findings related to the instant case. For example, his report contains the following statements:

- It is my opinion that the forearm on the Barnett Lady Raptor in question was not unreasonably dangerous and was reasonably safe to use.

- It is also my opinion that when used properly the string of the Barnett Lady Raptor would not cause any finger or hand injury to the user.

- It is also my opinion that the only true safeguard against finger injury is to follow the safety guidelines provided by the crossbow manufacturer and keep all body parts out of the path of the string and use the defined foregrip area that is safely below the string track.

- Based on my experience and observation of hundreds of crossbow shooters, it is exceedingly rare that a shooter's hand, accidentally or unintentionally, 'slides' up the stock or forearm to come to rest in a position that places the thumb or finger in jeopardy just prior to pulling the trigger. I do believe that an injury can happen when a shooter consciously grasps the forearm in an incorrect position while preparing to shoot whereby the shooter places his finger or thumb in the direct path of the string.

- The modern crossbow is a direct descendent of the first crossbow built in 5th Century BC, nearly 2500 years ago in eastern Asia. A sketch of a crossbow designed by Leonardi Di Vinci circa 1500 could be mistaken for a current model hanging on the shelf of a major retailer today. At the turn of the first millennia (1000 AD), mass produced crossbows were powerful enough to fire a bolt or arrow that could penetrate chain mail or plate armor at up to 300 yards.

- It is my opinion, based on observation of hundreds of crossbow shooters taking thousands of shots, that Mrs. Nemes did not hold the crossbow in the manner she described. She instead grasped the forearm of her crossbow in a manner that placed her thumb in the flight path of the string her preparation to fire the crossbow.

Because the Court has found Grace to be a general expert on crossbows based on his years of experience in the industry, the Court finds that he is qualified to opine about the general history, function, and design of crossbows, and general plausible causes of various crossbow injuries. But with regards to what he believes happened in the instant case and on November 18, 2016 to Mrs. Nemes with the specific Lady Raptor that she was using, Grace has failed to show that he relied on a reliable method in arriving at his conclusions.

Nowhere in the report does Grace indicate that he examined, measured, photographed, or evaluated the subject crossbow or any Lady Raptor model. Nowhere in the report does Grace indicate that he attempted to reconstruct the accident or otherwise test his hypothesis. Nowhere in the report does Grace contend that he watched existing videos of Mrs. Nemes' holding the Lady Raptor before deciding that she was holding it correctly.

Grace's testimony reflects the same. He testified that he did not have any records, notes, memoranda, or videotapes in his file – only a photograph of the Lady Raptor that he downloaded from the Internet. (Grace Dep. Ex 18, 9:14-22, ECF No. 56.) Similarly, he indicated that he merely reviewed Mrs. Nemes' deposition, (*id*. at 77, 147), regarding how she held the crossbow but did not personally demonstrate it or have Mrs. Nemes or another person demonstrate how it was held

in person. (*Id*. 16:1-11.) At best, Grace's testimony indicated that *at some point* he had held a Lady Raptor, but he did not testify that he held one specifically as part of his testing method for this case. And he admitted that he has never fired one. (*Id*.)

As far as external sources, such as materials, treatises, and other types of materials and information, Grace testified that he "didn't have any other materials." (*Id*. at 18:7-11.) He also testified that he did not receive any further facts, items, or evidence after issuing his report that he would use to change his testimony. (*Id*. at 54:2-6.) He even summarized himself that the essence of his methodology was a review of Mrs. Nemes's deposition: "the description of her injury being her thumb; her description of her – of her shooting technique and where she was standing or how she was holding it. She was – in my opinion, that she grabbed that crossbow with her thumb above the track or in the path of the string prior to pulling the trigger." (*Id*. at 83:9-16.)

The foundation for Grace's opinions on how Mrs. Nemes' held the Lady Raptor and injured herself rests on unstable ground—certainly, too unstable ground to pass muster under *Daubert*. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) (explaining that expert's testimony was fatally flawed when he did not isolate the variable he was testing and failed to apply a reliable methodology, of appropriate intellectual rigor, in formulating his opinion); *Washburn v. Merck & Co.*, 213 F.3d 627 (2d Cir. 2000) (affirming district court's decision not to admit expert opinion where that expert's opinion "did not emanate from his own research in the field, but rather was developed for the purposes of litigation."). Indeed, it was in *Kumho Tire* that the Supreme Court explained that there was a difference between an expert opining on general causation based on expertise and knowledge and specific causation based on actual evidence and observation. Hence, while Grace may testify as to his general knowledge about the causes of

crossbow injuries and crossbow designs, he may not opine as to his belief on the cause of Mrs. Nemes's injury without having analyzed or tested the device at issue.

**Van Durme's Methodology**

The Court last addresses Van Durme's methodology for arriving at his opinion and whether it suffices under *Daubert* to be admissible. Like Grace, Van Durme's testimony also colors the cause of Mrs. Nemes's injury. (*See* Van Durme Report, Def. Dec. Ex. 8, at 7, ECF No. 60.) ("These safety precautions need to be followed and the plaintiff's failure to take these precautions and failure to abide by these warnings are likely the sole cause of her injuries.")

In his report, Van Durme lists the following materials as those that he reviewed in anticipation of rendering his opinion:

- Deposition transcript of Jean Nemes taken on October 3, 2017;
- Deposition transcript of James Nemes taken on October 3, 2017;
- Plaintiff's Complaint;
- Owner's Manual for Barnett Lady Raptor fX crossbow;
- Caution sticker;
- Photographs produced by Plaintiff;
- Disclosure of Expert Testimony and Report from Brian O'Donel, P.E., March 26, 2018;
- Disclosure of Expert Testimony and Report from Dan Meadows, March 22, 2018.

(*See id*. at 1.) As with Grace's testimony, the Court finds that reviewing these documents is not a reliable method for Van Durme to opine on what he believes occurred on the day of the incident and caused Mrs. Nemes' injury. The purpose of an expert is to leverage their expertise and technical acumen to make it easier for the trier of fact to discern the truth. Here, Van Durme's opinion as to what he believes are the facts underlying the incident are simply his interpretation of her deposition transcript. As such, they unduly risk usurping the role of the trier of fact.

In his deposition, Van Durme testified that he never inspected Mrs. Nemes's Lady Raptor or another Lady Raptor in connection with his investigation. (*See* Van Durme Dep., Def. Dec. Ex. 3 at 21, 73.) He also never watched a video in which Mrs. Nemes purportedly demonstrated how she held the crossbow. (*Id*. at 57-58.) Although he said that he had shot a similar Raptor crossbow at one point, he did not do so in connection with this investigation. (*Id*. at 22, 73.) He also testified that when he did use a Raptor, he did not take down any data nor conduct any testing on how to prevent a user from making inadvertent contact with the string. (*Id*.at 45.) And he never measured Mrs. Nemes's hands, thumb, or the Lady Barnett's dimensions. (*Id*. at 113.) Rather he relied on his memory of the Lady Raptor design. (*Id*. at73.)

The Court acknowledges that this does not discredit all of his testimony. Van Durme still has extensive firsthand experience with crossbow use, training, and safety. He testified that he himself has fired a crossbow thousands of times, and has played an integral role helping the New York State Department of Environmental Conservation with its safety programs. And he states that he has instructed over a thousand students over the years in how to safely use a crossbow. (*Id*. at 38.) Van Durme has also traveled extensively to trade shows and spoken with various manufacturers about various crossbow models. (*Id*. at 51.) In so doing, Van Durme has also found a generic finger guard that at least one manufacturer tried to sell, which he tried to affix on several models, and which led him to believes that such finger guards have no efficacy and are nothing more than a "gimmick" (*Id*. at 46-48.) Therefore, some of his strong opinions—on the impossibility of a crossbow user sustaining a particular type of injury based on the mechanics of the crossbow design —are fairly reliable. (*See id*. at 58-60, 65.) They are simply not reliable insofar

as Van Durme seeks to apply them to the specifics of the incident related to which did no particularized testing.

As such, Van Durme may testify regarding his general beliefs about crossbow design as it relates to finger injuries. Comments such as the following will be admissible:

> The open design of the exposed string has been common to all crossbow designs for centuries. A great amount of force is needed to cock the crossbow and the user that has cocked a crossbow would be well aware of the path of the string as well as the speed and power of the string when the crossbow is fired. The risk of injury from placing one's hand in the path of the flex string is open and would have been obvious to any user.

(*Id.*) But having not tested the actual Lady Raptor, another Lady Raptor, or any physical crossbows, and having not tested or modeled Mrs. Nemes' theories of causation, including considering her hand measurements and placements and the design of the device at issue, the Court simply cannot allow Van Durme to testify about the cause of this specific incident.

As Plaintiffs note, Van Durme opines as to the very thing he was hired to help a jury evaluate, which is whether Mrs. Nemes's injury was caused by a defective device or her own negligence. He may not testify that Mrs. Nemes's hand placement was the cause of her injury simply by reading secondary documents and ruling out other hypothetical causes without looking at the device in question or conducting any sort of particularized analysis that build on his unique expertise. *See Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196 (1998) (explaining the shortcomings with expert's opinion being "based on the absence of contrary evidence, not on positive data….") To satisfy Rule 702, his "expert testimony must have a traceable, analytical basis in objective fact." *Id*. Thus, Van Durme may only opine as to general cause, not specific cause. Accordingly, Plaintiff's motion to exclude his testimony is granted in part.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Preclude is GRANTED in part and DENIED in part. Plaintiffs' expert, Brian O'Donel, may opine as to the Lady Raptor posing a substantial likelihood of harm and causing Mrs. Nemes's injury.

Plaintiffs' Motion to Preclude is also GRANTED in part and DENIED in part. Experts John V. Grace and Michael Van Durme may opine as to the general design features of crossbows and general causes of crossbow injuries, but they may not open as to what they believe factually occurred with Mrs. Nemes on October 18, 2016.

The parties are directed to confer and submit a case management plan by September 20, 2019. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 53, 56, and 57. This constitutes the Court's Opinion and Order.

Dated:    August 23, 2019                 SO ORDERED:
          White Plains, New York

                                          NELSON S. ROMÁN
                                      United States District Judge