UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEAN M. NEMES and JAMES NEMES,

                Plaintiffs.

    -against-

DICK'S SPORTING GOODS, INC., and
BARNETT OUTDOORS, LLC

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/23/2021____

No. 17-cv-1688 (NSR)
**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Jean Nemes ("Mrs. Nemes") and James Nemes ("Mr. Nemes") (together "Plaintiffs") commenced this action on March 8, 2017, asserting products liability claims against Defendants Dick's Sporting Goods, Inc. ("Dick's") and Barnett Outdoors, LLC ("Barnett") (together, "Defendants"). (*See* Complaint, ("Compl."), ECF No. 1.) Plaintiffs raised claims for common law negligence, strict tort liability, and breach of warranty. (*See id.* at 6-7.)[1] Presently before the Court is Defendants' Motion for Summary Judgment. For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.

## BACKGROUND

The following facts are derived from the Defendants' Rule 56.1 Statement of Material Facts ("Defs.' 56.1," ECF No. 69-3), Plaintiffs' Response to Defendants' Rule 56.1 Statement of Material Facts and Additional Material Facts that Plaintiffs Contend are Not in Dispute ("Pls.' 56.1," ECF No. 71-10), Defendants' Response to Plaintiffs' Rule 56.1 Statement of Additional

---

[1] Plaintiffs also brought a failure to warn claim. The parties stipulated to the dismissal of the failure to warn claim on August 9, 2018.

Material Facts ("Defs.' Reply 56.1," ECF No. 70-1), the parties' declarations, and the parties'

exhibits, and are not in dispute, except where noted.

On November 18, 2016, Mrs. Nemes unintentionally severed the thumb on her left hand

while using a crossbow manufactured by Barnett and marketed as the Barnett Lady Raptor FX

("Lady Raptor").  The Lady Raptor had been purchased at Dick's by Mr. Nemes for his wife,

Mrs. Nemes.  The question here is whether Defendants are liable for the harms Mrs. Nemes

experienced on November 18, 2016 under several design defect theories (sounding in contract

and tort) based upon the design of the Lady Raptor.

Prior to the accident, starting in or around June 2016, Mrs. Nemes—then 64 years old and

a retired school secretary—took up the sport of target shooting with a crossbow.  (Pls.' 56.1 ¶¶ 1

& 4.)  Mr. Nemes trained Mrs. Nemes how to use his crossbow, a different crossbow

manufactured by Barnett and marketed as the Barnett Reverse Raptor ("Reverse Raptor").  (*Id.*¶

5.)  Over the course of several months, Mrs. Nemes used the Reverse Raptor for target shooting

on approximately 20 to 30 occasions and fired over 100 shots in total.  (*Id.* ¶ 3.)  During this

time, Mr. Nemes showed Mrs. Nemes that the Reverse Raptor had a rail attached to the stock of

the crossbow and below the track where the string travelled to propel the bolt (referred to by the

parties, and herein, interchangeably as a "finger barrier," "finger reminder," and "finger guard"),

and Mrs. Nemes appreciated the risk of having any body part in the flight track while using the

Reverse Raptor.  (*Id.* ¶¶ 6-8.)

After becoming acquainted with target shooting, Plaintiffs set out to purchase Mrs.

Nemes her own crossbow.  Towards this end, on October 10, 2016, Plaintiffs went to two

sporting goods shops – Gander Mountain and Dick's.  (*Id.* ¶¶ 9-11.)  It was at Dick's that Mr.

Nemes ultimately purchased the Lady Raptor for Mrs. Nemes because she liked the feel and

weight of the crossbow and he had a positive impression of the manufacturer.  (*Id.*)
Subsequently, Mrs. Nemes read the Lady Raptor owner's manual cover to cover, and testified
that she read and understood all the warnings and instructions in the manual.  (*Id.* ¶ 12.)  Mrs.
Nemes understood that she was supposed to keep the fingers of her gripping hand below the
finger reminder and not in the way of the string path while she was firing the Lady Raptor, but
believed that the finger reminder would under all circumstances prevent her finger from being in
the way of the string.  (*Id.* ¶¶ 13-14.)  Over the next month, Mrs. Nemes shot the Lady Raptor
somewhere between 250 to 300 times without any problems. (*Id.* ¶ 15.)

On the day of the accident, Mrs. Nemes was target shooting on her property with Mr.
Nemes.  (*Id.* ¶ 17.)  Mrs. Nemes recalls that she was "free handing" the Lady Raptor, which is
the same manner of shooting that she employed during previous practice with the Lady Raptor.
(*Id.* ¶ 17 & 27.)  Free-handing refers to the firing of a crossbow where the user grips the foregrip
with one hand and pulls the trigger with the other hand.  By contrast, "rest" or "bench" shooting
involves the use of a bench or tripod device to support the crossbow instead of, or in addition to,
the user's gripping hand.  While "free handing" the Lady Raptor, Mrs. Nemes' left hand was
inside the foregrip and more towards "the front of the fore-grip."  (*Id.* ¶ 27.)  During the fateful
shot, Mrs. Nemes believed that the thumb of her left hand (which was gripping the fore-grip) was
below the finger reminder rail.  (*Id.* ¶ 19.)  It was not.  Instead, as she squeezed the trigger, the
bow string struck her left thumb, caused a significant laceration and nerve damage, and
amputated part, or all, of her thumb.  (*Id.* ¶ 20.)

This litigation largely revolves around certain design features of the Lady Raptor –
chiefly the "finger reminder" or "finger guard."  As mentioned, the finger reminder is a rail
running across the stock and below the flight track.  (*Id.* ¶ 13.)  The Lady Raptor's finger

reminder is approximately .513 inches wide at its narrowest point running across the foregrip, and is approximately .748 inches in its wider portions.  (Defs.' Reply 56.1 ¶ 37; Pls.' Exhibit B (ECF No. 71-2) at Nemes-Barnett000211.)  There is some disagreement as to the function of the finger reminder as Plaintiffs contend it is expected to, under all circumstances, prevent the finger from unintentionally rising into the path of the flight track (*see, e.g.*, Pls.' 56.1 ¶ 34), whereas Defendants contend it is only supposed to provide tactile feedback to cause the user to be mindful of their finger placement while using the Lady Raptor (*see, e.g.*, Defs.' Reply 56.1 ¶ 34).

As is the case with the vast majority of design defect litigation, the parties engaged in extensive expert discovery, produced reports to support their theories concerning the design of the Lady Raptor, and then filed Daubert motions challenging the reliability of their opponents' expert.  The Report of Plaintiffs' expert Brian O'Donel (the "O'Donel Report") (ECF No. 71-5) concluded, among other things, that: (1) "the crossbow design exposed the user to the string motion hazard [and] created a dangerous condition that was a cause of [Mrs.] Nemes' injury"; (2) "the injury to [Mrs.] Nemes was foreseeable to Barnett"; (3) "Barnett's failure to provide an adequate safeguard was a design defect, making the crossbow unreasonably dangerous, unsafe for its intended use, and was a cause of [Mrs.] Nemes' injury"; (4) "[o]thers in industry recognize this hazard and provide means to protect people"; (5) "Barnett's failure to provide an adequate safeguard deprived [Mrs.] Nemes of the protection that others in the industry provided"; and (6) "[s]afer alternatives were feasible and available to Barnett and would not have defeated the utility of the product."  (O'Donel Report at 18.)

As relevant here, Defendants' motion to preclude Plaintiffs' proposed expert Brian O'Donel was granted in part and denied in part.  In short, the Court held that O'Donel was precluded from testifying about a feasible alternative design to the Lady Raptor and only

permitted him to opine as to the Lady Raptor posing a substantial likelihood of harm and causing Mrs. Nemes' injury. *See Nemes v. Dick's Sporting Goods, Inc.*, No. 17-CV-1688 (NSR), 2019 WL 3982212, at *10 (S.D.N.Y. Aug. 23, 2019).

Now Defendants move for summary judgment arguing, among other things, that because Plaintiffs cannot present expert evidence as to the feasibility of an alternative design, they cannot satisfy their burden to set forth a prima facie strict products liability claim. (*See* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, ("Defs.' Mem."), ECF No. 69.) Plaintiffs respond that, among other things, summary judgment is not warranted because they are capable of establishing the feasibility of an alternative design without expert evidence. (*See* Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment ("Pls.' Opp."), ECF No. 71-11.) Defendants further respond that Plaintiffs have failed to establish the technological and economic feasibility of an alternative design through non-expert evidence. (*See* Defendants' Reply Memorandum in Further Support of Motion for Summary Judgment ("Defs.' Reply Mem."), ECF No. 70.)

## STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party does not have the burden of proof, the moving party may satisfy its burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts

5

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 Fed. Appx. 34, 36 (2d Cir. 2013) (summ. order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Similarly, "a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts prior deposition testimony." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) (*citing Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) (such affidavits "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact")). But the mere fact that a non-movant's factual allegations in opposition are "self-serving" does not automatically render them insufficient to defeat summary judgment. *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). Instead, summary judgment should be granted when a party

"fails to make a showing sufficient to establish the existence of an element essential to that party's case," where "that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

## DISCUSSION

### I.   Strict Products Liability Based Upon Design Defect

In New York, "to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204, 208 (1983). The design of a product is "not reasonably safe" if "a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* at 108. "The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Id.* "This standard demands an inquiry into such factors as (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost

7

of any safety-related design changes." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257, 662 N.E.2d 730, 735 (1995).

Defendants argue that Plaintiffs' strict products liability claim fails because Plaintiffs lack sufficient evidence to satisfy their burden to present evidence that a feasible alternative design exists for the Lady Raptor. Plaintiffs allegedly fail to satisfy their burden because this Court excluded their expert evidence with respect to a feasible alternative design and numerous courts in this Circuit have held that expert testimony is needed in order to establish the existence of an alternative feasible design. *See, e.g.*, *Kass v. W. Bend Co.*, 158 F. App'x 352, 353 (2d Cir.2005) (affirming district court's grant of summary judgment after court excluded plaintiff's proffered expert testimony in full); *Lara v. Delta Int'l Mach. Corp.*, 174 F.Supp.3d 719, 740 (E.D.N.Y. 2016) ("In order to prove liability grounded upon a design defect, New York law requires plaintiffs to proffer expert testimony as to the feasibility and efficacy of alternative designs."); *Frazer v. ITW Food Equip. Grp. LLC*, No. 11-CV-9699 CS, 2013 WL 6164486, at *5 (S.D.N.Y. Nov. 22, 2013) ("A party cannot survive summary judgment on a design defect claim without admissible expert testimony."); *Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06–CV–3898, 2009 WL 3334364, at *6 (E.D.N.Y. Oct. 15, 2009) (collecting cases); *Sorto-Romero v. Delta Int'l Mach. Corp.*, No. 05-CV-5172 SJF AKT, 2007 WL 2816191, at *10 (E.D.N.Y. Sept. 24, 2007) ("In order to establish that an alternative design would have permitted Plaintiff to avoid injury, he must present an opinion from a person with specific technical and scientific knowledge beyond the ken of an average person. Without such evidence, the jury cannot fairly decide the issue.").

Plaintiffs respond that the lack of expert evidence supporting the feasibility of alternative design is not fatal to their design defect claim because they can present sufficient non-expert

8

evidence to make out a prima facie strict liability claim.  Several courts have reached similar (if distinguishable) conclusions.  *See, e.g.*, *Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 520 (E.D.N.Y. 2019) ("[E]ven where expert testimony concerning a specific alleged defect is excluded, the circumstances of the accident alone may permit an inference of a product defect sufficient to withstand summary judgment."); *Castaldi v. Land Rover N. Am., Inc.*, No. 06-CV-1008JGKAM, 2007 WL 4165283, at \*10 (E.D.N.Y. Nov. 21, 2007); *Buckley v. Gen. Motors Corp.*, 2004 WL 725933, at \*3 (S.D.N.Y. Apr. 2, 2004).

The "competing" caselaw cited by Plaintiffs and Defendants is easily reconciled. Defendants are correct that often times a plaintiff cannot withstand summary judgment without expert testimony.  Plaintiffs are also correct that non-expert testimony may be sufficient to establish a feasible alternative design where the economic and technological feasibility of an alternative design is obvious or capable of being understood by laypersons through the use of non-expert evidence.  *See, e.g.*, *Engler v. MTD Prod., Inc.*, No. 13-CV-575 CFH, 2015 WL 900126, at \*14 (N.D.N.Y. Mar. 2, 2015) ("Under New York law, unless the reasonable alternative design is obvious and understandable to a layperson, a plaintiff seeking to establish a design defect is required to submit expert testimony as to the feasibility and efficacy of alternative designs."); *Quiles v. Bradford-White Corp.*, No. 10-CV-747, 2012 WL 1355262, at \*8 (N.D.N.Y. Apr. 18, 2012) ("The design defect claim requires expert testimony as to the feasibility and efficacy of alternative designs . . . an exception to this rule exists if a reasonable alternative design is both obvious to and understandable by a layperson[.]"); *Soliman v. Daimler AG*, No. 10-CV-408 SJF AKT, 2011 WL 4594313, at \*3 (E.D.N.Y. Sept. 30, 2011) ("[T]he Court does not agree that the alleged design flaws are 'simple,' or that they would be obvious to and understandable by a layperson. Thus, expert testimony is required."); *Maxwell v. Howmedica*

9

*Osteonics Corp.*, 713 F. Supp. 2d 84, 91 (N.D.N.Y. 2010) ("[U]nless a reasonable alternative design is both obvious to and understandable by a layperson, an expert is needed."). By contrast, "New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases involving more complex design issues." *Guarascio v. Drake Assocs. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008) (collecting cases).

Plaintiffs claim that "the reasonable alternative design [*i.e.*, a wider finger guard] is both obvious to, and understandable by a lay person" such that "expert testimony is unnecessary." (Pls.' Opp. at 10 (citing *Guarascio*, 582 F. Supp. 2d 459; *Maxwell*, 713 F. Supp. 2d 84)). Neither of the cases Plaintiffs cite for this position are helpful to their argument. First, Plaintiffs are relying upon dicta as both *Guarascio* and *Maxwell* ultimately held that the feasibility of an alternative design was not capable of being established by non-expert evidence presented in those cases. *See Maxwell*, 713 F. Supp. 2d at 12 (holding that the toxicity of the Nickel in knee replacement systems is not within the understanding of the ordinary juror, who is a layperson); *Guarascio*, 582 F. Supp. 2d at 464 ("A lay person would neither readily understand nor necessarily find obvious the design and engineering of an air filtration manifold, containing two filtration canisters, filters, valves from which the air enters and exits the filtration, and an emergency back-up valve attached to a scuba tank."). Second, the reasoning of both cases—*i.e.*, that lay jurors could not comprehend the toxicology of certain metals in medical devices or the engineering in an air filtration manifold—undermines Plaintiffs' argument because the reasonableness of a crossbow design also requires some comprehension of engineering.

Relatedly, Plaintiffs attempt to analogize their case to several clearly distinguishable cases. For example, Plaintiffs cite *Jarvis v. Ford Motor Co.*, 283 F.3d 33 (2d Cir. 2002), for the broad position that "[e]xpert testimony is only necessary when the witness cannot provide

evidence." (Pls.' Opp. at 9.) Likewise, Plaintiffs cites *Faryniarz v. Nike, Inc. (Faryniarz I)*, 2002 WL 530997 (S.D.N.Y. 2002) for the position that "expert testimony is only necessary if the witness cannot provide other evidence." (Pls.' Opp. at 9.) Neither *Jarvis* nor *Faryniarz I* stand for such broad propositions nor are those cases particularly instructive here because they do not concern whether non-expert evidence is capable of establishing a feasible alternative design. Instead, both cases are limited to whether non-expert testimony can establish that an alleged design defect *was the cause* of a plaintiff's injury. *See Jarvis*, 283 F.3d at 47; *Faryniarz I*, 2002 WL 530997, at *2.

Among the authorities relied upon by Plaintiffs, only one reflects a court in this Circuit holding that a feasible alternative design was sufficiently demonstrated through non-expert evidence to withstand summary judgment – *i.e.*, *Castaldi*, 2007 WL 4165283 (E.D.N.Y. Nov. 21, 2007). (Pls.' Opp. at 6.) The court in *Castaldi* held that testimony from non-expert "witnesses who have driven a car with automatic transmission [concerning] the functioning of brake shift interlocks based on their personal knowledge" along with a NHTSA report indicating that "intermittent functioning of the brake shift interlock was sufficiently unusual to warrant an investigation" constituted sufficient evidence to establish a prima facie design defect claim. *Castaldi*, 2007 WL 4165283, at *11.

*Castaldi* does not strike this Court as persuasive in resolving the instant case as that court did not articulate what was *distinct* about the design of the alternate break shift interlock system, as compared to the purportedly defective product, other than that the design would be "functional." *Id.* Accordingly, it provides little guidance as to whether the evidence presented here compels a similar conclusion. *Castaldi* also appears to misread certain caselaw insofar as it characterizes the holding in *Faryniarz v. Nike, Inc. (Faryniarz II)*, No. 00 Civ. 2623(NRB), 2002

11

WL 1968351 (S.D.N.Y. Aug.23, 2002) as having "**<u>allowed the plaintiff to go to trial</u>** with [non-expert] testimony regarding the presence of alternative designs." *Castaldi*, 2007 WL 4165283, at *10 (emphasis added) (citing *Farniarz II*, 2002 WL 1968351, at *3). The court in *Faryniarz II* was faced with a motion in *limine*—not a dispositive motion—and held that plaintiff's expert could offer testimony at trial based upon personal experience concerning "the presence of various lacing schemes and pull-tab placements in different shoe models" but "cannot offer testimony as to what alternate designs could have prevented the fall"—not that plaintiff's lay testimony regarding pull-tabs satisfied plaintiff's obligation to make out a prima facie case for strict liability so as to avoid summary judgment and proceed to trial. *Farniarz II*, 2002 WL 1968351, at *4.

In the instant case, Plaintiffs identify several forms of non-expert evidence that they would introduce at trial, including: (1) comparable crossbows that employ wider finger barriers; (2) lay-testimony from Mr. Nemes concerning a finger barrier that he designed; (3) testimony from Defendants' employees concerning the ability to design a wider finger barrier; and (4) a U.S. Consumer Product Safety Commission Report. (Pls.' Opp. at 7-10.) This evidence is insufficient to survive a motion for summary judgment for two reasons.

*First*, the Court does not agree that a lay person would readily understand, much less find obvious, the nature of crossbow design. The inquiry here—*i.e.*, whether a wider finger guard on the Lady Raptor is a feasible alternate design—is similar to issues faced by courts that granted summary judgment based on the lack of expert evidence. For example, the court in *Pigliavento v. Tyler Equip. Corp.*, granted defendant's motion for summary judgment where plaintiff failed to offer non-conclusory expert testimony concerning the omission of a guardrail on a concrete mixer truck. 248 A.D.2d 840, 841, 669 N.Y.S.2d 747 (3d Dept. 1998). Numerous other courts

12

have reached similar conclusions with respect to cases involving the absence of, or flaws associated with, physical safety barriers.  S*ee, e.g.*, *Redmond v. Teledyne Landis Mach.*, No. 515CV00646MADATB, 2017 WL 2465173, at *14 (N.D.N.Y. June 7, 2017) (granting summary judgment in favor of defendant after plaintiff's expert report concerning feasibility of a safety guard as an alternative design to a pipe-cutting machine was excluded); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 252 (E.D.N.Y. 2014) (granting summary judgment in favor of defendant where plaintiff did not present expert testimony concerning the feasibility of a trap guard as an alternative design on a saw); *Tiner v. Gen. Motors Corp.*, 909 F. Supp. 112, 117 (N.D.N.Y.1995) ("Matters such as the tolerance a seat belt should allow for movement after a collision are not within the ken of the average juror.").  Accordingly, this is not the sort of case capable of being proven by non-expert testimony.

*Second*, even if the design of a crossbow was obvious to a layperson, the evidence presented by Plaintiffs fails to establish that the alternative design would have led to overall improved safety.  *Maxwell*, 713 F. Supp. 2d at 92 ("a plaintiff must demonstrate that the alternative design would have lead [sic] to overall improved safety (and that the defendant's design created a substantial likelihood of harm), which requires a risk-utility balancing.").  Here, Plaintiffs' evidence, at best, suggests that Defendants could have fabricated a wider finger guard, but does not demonstrate (beyond speculation) that this would have prevented Mrs. Nemes' finger from rising above the finger guard (into the line of fire) nor is there any proposed testimony or other evidence establishing that, in the aggregate among consumers, the presence of a finger guard would have reduced the incidents of similar harms.

As the Court previously noted in addressing the parties' Daubert motion, Plaintiffs' expert evidence "does not belabor the improvements of [comparators with wider finger

13

reminders]" and "at best . . . merely speculates about their hypothetical superiority." *Nemes*, 2019 WL 3982212, at *8. Plaintiffs' non-expert testimony does not fare any better.

For the reasons set forth above, the Court grants summary judgment in favor of Defendants with respect to Plaintiffs' strict products liability claim for design defect.

## II.    Negligence Based on Design Defect

Although strict liability and negligence are distinct theories, courts often analyze strict liability and negligence claims together on the theory that they are "functionally equivalent." *Erazo v. SCM Grp. N. Am.*, No. 16CV2386RRMRER, 2019 WL 1044365, at *19 (E.D.N.Y. Mar. 5, 2019). A slight tension exists between federal and state jurisprudence as the Second Circuit has questioned whether strict liability and negligence claims for design defects are functionally equivalent, while "the New York Court of Appeals has also stated that '[i]n general, . . . the strict liability concept of 'defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing.'" *Id.* at *20 (quoting *Denny*, 87 N.Y.2d at 258). As in *Erazo*, this Court does not need to reach the issue of whether negligence and strict liability claims for design defects are functionally equivalent because Defendants here argue that Plaintiffs' design defect claims (whether negligence or strict liability) are deficient insofar as Plaintiffs have not established that it was feasible to design the Lady Raptor in a safer manner. The feasibility of an alternative design is an "element[] of design-defect claims under both strict product liability and negligence theories." *Erazo*, 2019 WL 1044365, at *20; *see also Adamo v. Brown & Williamson Tobacco Corp.*, 11 N.Y.3d 545, 550, 900 N.E.2d 966, 968 (2008) ("While this is a negligence, not a strict liability, case, similar requirements apply—specifically, plaintiffs here had to prove that "it was feasible to design the product in a safer manner." (quotation marks omitted)).

As discussed in more detail above, Plaintiffs have failed to establish a feasible alternative design to the Lady Raptor. Accordingly, the Court grants summary judgment in favor of Defendants with respect to Plaintiffs' negligence claim for design defect.

## III.    Breach of Implied Warranty of Fitness for a Particular Purpose Claim

The Complaint assert a single cause of action for breach of the implied warranties of merchantability and fitness for a particular purpose. Plaintiffs continue to treat the claims as analytically indistinguishable in their opposition papers to this instant motion. This is unfortunate, as the two implied warranties constitute two separate causes of action recognized in different portions of the New York Uniform Commercial Code. The gist of the distinction between the two claims boils down to the purpose for which the consumer intends to use the product at issue – *i.e.*, the implied warranty of fitness warrants that goods shall be fit for "any *particular purpose* for which the goods are required" (N.Y. U.C.C. § 2-315 (emphasis added)), whereas the implied warranty of merchantability warrants that goods are at least "fit for the *ordinary purposes* for which such goods are used" (N.Y. U.C.C. § 2-314(2)(c) (emphasis added)). As the official commentary to U.C.C. § 2-315 notes:

> A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

N.Y. U.C.C. Law § 2-315 (Official Comment).

Plaintiffs nominally characterize their claim as one for breach of implied warranty of fitness for a particular purpose but make no attempt to identify a "particular purpose" for which the Lady Raptor was intended and, instead, exclusively argue that the Lady Raptor was not safe

15

for its "ordinary purpose." (Pls.' Opp. at 10-14.) Likewise, the Complaint does not indicate any peculiar intended purpose for the crossbow as Plaintiffs alleged that it was purchased "for [Mrs. Nemes'] personal, family or household use" (Compl. ¶ 18) and that Mrs. Nemes in fact used it for "target practicing" (Compl. ¶ 20). Because Plaintiffs fail to assert any allegation regarding the existence of a particular purpose for which the crossbow was purchased their claim is facially deficient. *Spano v. Domenick's Collision*, 50 Misc. 3d 143(A), 31 N.Y.S.3d 924 (2d Dept. Feb. 23, 2016) (finding "there was no breach of an implied warranty of fitness for a particular purpose (*see* UCC 2–315), as there was no showing of any 'particular purpose' for which the [product] was purchased.").

Moreover, the record before the Court demonstrates that there is no factual dispute that Plaintiffs purchased the crossbow for the purpose of permitting Mrs. Nemes to engage in target shooting. (*See, e.g.*, Pls.' R.56.1 ¶¶ 4; 9; 10; and 11; Pls.' Exhibit H (ECF No. 71-8) ¶ 2 ("I purchased the Lady Raptor FX ('Lady Raptor') crossbow . . . for my wife to use for target practice.")) Target shooting is an ordinary purpose for which a crossbow is used. Accordingly, Plaintiffs' claim fails because "it would render the implied warranty for a particular purpose superfluous since such a claim could be encompassed within the implied warranty of merchantability itself." *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 897 (E.D.N.Y. 2018), *adhered to on reconsideration*, No. 18CV0334SJFSIL, 2019 WL 1118052 (E.D.N.Y. Mar. 11, 2019).

The Court grants Defendants' motion for summary judgment with respect to Plaintiffs' claim for implied warranty of fitness for a particular purpose.

16

## IV.    Breach of Implied Warranty of Merchantability

### A.    Legal Standard

As mentioned above, the implied warranty of merchantability is governed by New York Uniform Commercial Code Section 2-314(1), which provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Goods are considered merchantable if they are "fit for the ordinary purposes for which such goods are used." N.Y.U.C.C. § 2-314(2)(c). To establish a breach of the implied warranty of merchantability, a plaintiff must show that "a defect in the product was a substantial factor in causing the injury and . . . the defect complained of existed at the time the product left the manufacturer or entity in the line of distribution being sued." *DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 627 (S.D.N.Y. 2012). The alleged defect may arise from "a manufacturing flaw, improper design, or a failure to provide adequate warnings regarding use of the product." *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 345 (S.D.N.Y. 2006) (*quoting Langer v. Well Done, Ltd.*, 11 Misc. 3d 1056(A), 815 N.Y.S.2d 494 (Table), at *2 (Sup. Ct., Nassau County Jan. 31, 2006)). "This standard does not require that the goods be perfect, or that they fulfill [a] buyer's every expectation; it requires only that the goods sold be of a minimal level of quality." *Green v. Covidien LP*, No. 18 Civ. 2939 (PGG), 2019 WL 4142480, at *5 (S.D.N.Y. Aug. 30, 2019) (*quoting Caronia v. Philip Morris* USA, Inc., 715 F.3d 417, 433 (2d Cir. 2013)).

"Although a cause of action for breach of warranty is a contractual remedy . . . which seeks to provide the parties with the benefit of their bargain, a warranty extends to a person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 681–82 (E.D.N.Y. 2013) (citations omitted). Additionally, "[a]s in other product liability

17

actions, in an action pleaded in breach of warranty, 'it is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury and . . . that the defect complained of existed at the time the product left the manufacturer or entity in the line of distribution being sued.'" *Cruz v. Kumho Tire Co.*, No. 8:10-CV-219 MAD/CFH, 2015 WL 2193796, at \*18 (N.D.N.Y. May 11, 2015) (quoting *Fritz v. White Consol. Indus., Inc.*, 306 A.D.2d 896, 898 (4th Dept. 2003)); *see also Beckford v. Pantresse, Inc.*, 51 A.D.3d 958, 959, 858 N.Y.S.2d 794, 795 (2d Dept. 2008) ("Whether the action is pleaded in strict products liability, breach of warranty, or negligence, the consumer has the burden of showing that a defect in the product was a substantial factor in causing the injury."); *Tardella v. RJR Nabisco, Inc.*, 178 A.D.2d 737, 737, 576 N.Y.S.2d 965, 966 (3d Dept. 1991) ("[I]t is a consumer's burden to show that a defect in the product was a substantial factor in causing the injury and, of greatest significance here, that the defect complained of existed at the time the product left the manufacturer or entity in the line of distribution being sued."); *McGuinness v. Jakubiak*, 106 Misc. 2d 317, 325, 431 N.Y.S.2d 755, 760 (Sup. Ct., Kings County 1980) ("To establish a claim for breach of implied warranty in a product liability case, plaintiff must show that the product which he used was not reasonably fit for the purpose for which it was intended and that such product was the proximate cause of his injuries.").

As discussed in further detail below, an implied warranty does not automatically fail where a strict products liability is found to be deficient. This is because the concept of what constitutes a "defect" is slightly different in the two causes of action. In strict products liability, a defect "requires a weighing of the product's dangers against its over-all advantages" whereas "the UCC's concept of a 'defective' product requires an inquiry only into whether the product in question was 'fit for the ordinary purposes for which such goods are used.'" *Denny v. Ford*

18

*Motor Co.*, 87 N.Y.2d 248, 258, 662 N.E.2d 730, 736 (1995).  That notwithstanding, the New York Court of Appeals predicted that "[a]s a practical matter, the distinction between the defect concepts in tort law and in implied warranty theory may have little or no effect in most cases." *Id.*

> B.      *Application to Instant Case*

The parties dispute how the ordinary purpose of the relevant product should be defined and whether Plaintiffs' implied warranty claim can survive given the Court's conclusion that Plaintiffs' strict liability claim is deficient.  The Court concludes that: (1) the only tenable "ordinary purpose" alleged by Plaintiffs is to engage in target practice (though hunting or firing the crossbow in any other reasonably foreseeable context, *e.g.*, self-defense, would also be within the scope of an "ordinary purpose" of a crossbow); (2) that very purpose, *i.e.*, target practice, was also considered in the ruling on Plaintiffs' strict liability claim, (3) Plaintiffs offer no additional factual bases or distinct "ordinary purpose" for their implied warranty claim, and, (4) accordingly, their implied warranty claim also fails.

> 1.      *Defining the Operative Ordinary Purpose*

Plaintiffs appear to largely concede that the operative ordinary purpose that must be assessed with respect to their implied warranty claim is "target shooting."  For example, Plaintiffs state that, "[t]he crossbow was not reasonably fit for its *intended purpose of targeting shooting*[.]"  (Pls.' Opp. at 2 (emphasis added).)  Similarly, Plaintiffs argue that "the intended purpose of the crossbow is to *be able to fire it* without getting your thumb blown off[.]"  (Pls.' Opp. at 3 (emphasis added).)  Finally, Plaintiffs also argue that in order to "be minimally safe for its intended purpose" the crossbow must be "designed in such a manner that the thumb or fingers are prevented from coming into contact with the bowstring and injuring the shooter."  (Pls.' Opp. at 11.)

Though unclear, Plaintiffs also seem to assert that the Court should analyze the ordinary purpose of the finger reminders, separate from the crossbow, as a distinct basis for liability. For example, Plaintiffs state that "Defendants breached their implied warranties as to the '*finger reminders*' as reflected in Ms. Nemes' testimony of what her expectation of what their intended purpose was." (Pls.' Opp. at 11.) Likewise, Plaintiffs conclude that "a jury could find that the crossbow's *finger reminders* were unsafe for the purpose for which it was marketed and sold."[2] (Pls.' Opp. at 12.)

In support of this position, Plaintiffs cite to *Castro v. QVC Network, Inc.*, in which the Second Circuit held that appellants were entitled to separate breach of warranty and strict liability charges because the product had multiple intended uses including (1) as a roaster for a twenty-five pound turkey, and (2) as a device for cooking low volume foods such as casseroles, cutlets, and cookies. 139 F.3d 114, 119 (2d Cir. 1998). That holding does not reflect that a product's component parts, *e.g.*, the handle of the pan, define the ordinary purpose of that product. Plaintiffs also point to *Henry v. Rehab Plus*, where the court posited that a back support belt might have two distinct purposes including: (1) to prevent back injuries and (2) to remind individuals to lift carefully or with proper posture. *Henry v. Rehab Plus Inc.*, 404 F. Supp. 2d 435, 444 (E.D.N.Y. 2005). Both of those ordinary purposes refer to the function of the entire product—*i.e.*, the back support belt—not a component of that good, *e.g.*, the velcro fastener. At bottom, Plaintiffs have not presented a single case to this Court in which the ordinary purpose of a good was defined by the operability of a safety component of the good.

---

[2] To be clear, there is no allegation in the Complaint nor any factual averment in Pls.' R.56.1 suggesting that Plaintiffs distinctly purchased a finger reminder from Defendants. Instead, the record establishes beyond dispute Mr. Nemes purchased a crossbow equipped with a finger reminder. (*See, e.g.*, Pls.' R.56.1 ¶ 13; Compl. 21 ("There was an inadequate thumb/finger guard on the crossbow when it was purchased"). Nor is there any allegation that Defendants distinctly marketed the finger guard.

Likewise, the inadequacy of a part or component of a product can undoubtedly result in the product being unfit for *the product's* ordinary purpose.  For example, faulty electrical components within a car can render the car unfit for its ordinary purpose of driving.  *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 232 (S.D.N.Y. 2015); *see also Flores v. Youm*, 69 Misc. 3d 1216(A), 133 N.Y.S.3d 786 (Sup. Ct., Bronx County 2020) (holding that plaintiff adequately pleaded an implied warranty claim where plaintiff alleged that the "ordinary purpose for which it was intended, [was] as a reasonably safe and fit prosthetic device for a total knee replacement" and that it "was defective and not reasonably fit to be used for its intended purpose, as its component parts had a propensity to fail, loosen prematurely, and require revision surgery.").  Relatedly, the ordinary purpose of a component of a larger machine or tool may be operative to an implied warranty claim where that component was purchased separately from the whole device.  For example, a component part manufacturer may be liable for a design defect when selling a discrete part to consumers or intermediate sellers, such as a radio frequency power amplifier.  *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 CV 1851 NGG RML, 2006 WL 6937123, at *12 (E.D.N.Y. July 11, 2006), *report and recommendation adopted*, No. 03-CV-1851(NGG)(RML), 2006 WL 2524187 (E.D.N.Y. Aug. 30, 2006) (finding that "there exist triable issues of fact as to what a customer's reasonable expectation would be for the performance of [component] amplifiers when used in the customary, usual and foreseeable manner.").

But the ordinary purpose of a good is not usually defined by the individual function of an ancillary component.  For example, the ordinary *purpose* of a car is not to activate a locking mechanism on the driver side door by operating a key fob, even though this may be an ordinary *feature* of a car and such a defect may render the car unfit for its ordinary purpose of driving.

Instead, "the implied warranty is breached where **the product in question** is not fit for the ordinary purpose for which it is to be used." *Dayton Superior Corp. v. Spa Steel Prod., Inc.*, No. 1:08-CV-1312 FJS/RFT, 2012 WL 113663, at *5 (N.D.N.Y. Jan. 13, 2012) (quoting *Plemmons v. Steelcase Inc.*, No. 04 Civ. 4023, 2007 WL 950137, *3 (S.D.N.Y. Mar. 29, 2007)) (emphasis added).  There is no dispute that the product purchased by Plaintiffs was a crossbow and, accordingly, the operative ordinary purpose must be assessed with respect to the crossbow rather than the finger guard.

Likewise, the "inquiry focuses on the expectations of the product's performance when used in the customary, usual, and reasonably foreseeable manner."  93 N.Y. Jur. 2d Sales § 243. It is of course true that, under New York law, what constitutes foreseeable product use is generally a jury question.  *See Vinogradov v. Clicquot Club Co.*, 55 A.D.2d 489, 491, 391 N.Y.S.2d 18 (3d Dept. 1977).  Nonetheless, this counsels that courts should leave determinations of foreseeability of a product's use to a fact finder.  If Plaintiffs articulated a distinct use of the crossbow, then the Court would be compelled to ask the jury to determine whether the hypothetical use—*e.g.*, firing a crossbow while running—was foreseeable.  But, there is no question to ask a jury here because Plaintiffs, instead of proposing a use of a crossbow, state that the operative ordinary purpose here is "to give the shooter tactile feedback as to where their hands were placed to ensure they kept them below the flight track" or "protect[ the user's] thumb from being in the way of the string." (Pls.' Opp. at 11-12.)  Plaintiffs do not set forth an independent use of the crossbow and instead describe the operation of a safety feature *during* target practice or hunting.  Accordingly, even in Plaintiffs' own account, hunting, target shooting, or otherwise firing the crossbow is the operative use of the Lady Raptor.

Separately, Plaintiffs fail to introduce a dispute of material fact by asserting that "barrier guard/finger reminder [were not] fit for its ordinary purpose, to prevent a user's thumb or fingers from inadvertently rising into the string path" (Pls.' R.56.1 ¶ 48) based on a mischaracterization of the O'Donel Report.  For example, Plaintiffs cite to pages 16 through 17 of the O'Donel Report for the position that "the barrier guard was also found to be unfit for its intended purpose by Expert O'Donel, because the finger reminders were not wide enough."  (Pls.' Opp. at 12 (citing O'Donel Report at 16-17).)  But, the O'Donel Report does not purport to analyze the ordinary purposes for which finger barriers are used as distinct from the Lady Raptor itself. Indeed, O'Donel clearly analyzed the ordinary purpose and uses of a *crossbow* when he opines that "crossbow manufacturers must consider the users and conditions of use" including "target shooting, seated or standing, bench resting or free hand, to many conditions and angles of hunting."  (O'Donel Report at 14.)  Likewise, O'Donel's ultimate findings concern the "intended use" of the crossbow rather than the finger guard – *i.e.*, he finds that "Barnett's failure to provide an adequate safeguard was a design defect, **making the crossbow** unreasonably dangerous, **unsafe for its intended use**, and was a cause of Nemes' injury."  (O'Donel Report at 20 (emphasis added).)

Accordingly, the Court concludes that Plaintiffs' sole colorable argument is that the crossbow is not fit for its ordinary purposes of target practicing, hunting, or firing the crossbow in any other customary or reasonably foreseeable manner, because the allegedly defective finger reminders failed to prevent fingers from being exposed to the fired bowstring.

   2. *Viability of an Implied Warranty Claim Where Design Defect Claim Fails*

Defendants argue that, while an implied warranty claim can independently survive even where a strict liability claim fails, such a divergent holding is not appropriate here.  Plaintiffs' implied warranty claim can only survive to the extent that the "ordinary purpose" of the

crossbow is distinct from the purpose for which the Court has already determined that the utility outweighs the risk (in the context of assessing their strict liability claim).  (Defs.' Mem. at 7-8.) To be clear, an implied warranty claim can survive where a strict liability claim fails because they stem from different bodies of law, *i.e.*, contract and tort law, respectively.  Instead, Defendants note that a determination that a design defect claim fails reflects a determination that the product's utility outweighs its risk for a certain purpose.  Accordingly, in those cases, an implied warranty claim can only survive to the extent the "ordinary purpose" for which the product was sold and marketed is not the same as the purpose that provides the utility that outweighs the risk of injury.  *Gonzalez by Gonzalez v. Morflo Indus., Inc.*, 931 F. Supp. 159, 167 (E.D.N.Y. 1996).

The standard recited in *Gonzalez by Gonzalez*, is drawn from *Denny*, in which the New York Court of Appeals concluded that a jury could rationally find that a vehicle's use as an off-road vehicle outweighed the risk of injury from rollovers, but that the vehicle was not safe for its ordinary purpose of road driving.  87 N.Y.2d at 263, 639 N.Y.S.2d 250, 662 N.E.2d 730. "Crucial to the determination is that the 'ordinary purpose' for which the product was marketed and sold to the plaintiff, *i.e.*, routine highway and suburban street driving, was not the same as the utility of the vehicle's characteristics enabling the vehicle to drive over highly irregular terrain typifying off-road travel, against which the increased risk of rollover accidents when the vehicle was driven on paved roads was to be weighed." *Arnold v. Krause, Inc.*, 232 F.R.D. 58, 73 (W.D.N.Y. 2004), *aff'd and adopted*, 233 F.R.D. 126 (W.D.N.Y. 2005).

Where a plaintiff fails to submit "anything in opposition to summary judgment establishing separate factual bases for their breach of implied warranty of merchantability claims and the strict products liability claim based on defective design," the implied warranty claim fails

alongside the design defect claim.  *Arnold*, 232 F.R.D. at 74 (W.D.N.Y. 2004).  For example, in *Arnold*, the plaintiffs implied warranty and design defect claims were predicated upon the same factual bases—*i.e.*, the product ladder was alleged to be defective because it collapsed while plaintiff was climbing it—, plaintiffs did not "establish that their . . . breach of implied warranty differs from their claim . . . for strict products liability," and accordingly, summary judgment was warranted.  *Id.*; *see also Barrett v. Black & Decker (U.S.) Inc.*, No. 06 CIV. 1970(SCR)MDF, 2008 WL 5170200, at *12 (S.D.N.Y. Dec. 9, 2008) (granting summary judgment where "Plaintiff has not alleged sufficient facts to distinguish his claim for breach of implied warranty from his claim alleging strict products liability based on defective design.").

Similarly, in *Gonzalez by Gonzalez*, the court concluded that, the ordinary purpose of the relevant product was to heat water, plaintiffs failed to establish that the risks outweighed the utility associated with the product's ability to raise the temperature to water level that could scald the human body, and, accordingly, plaintiffs could not make out a case that the product was not fit for its ordinary purpose.  931 F. Supp. at 167 (E.D.N.Y. 1996); *see also Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 449 (W.D.N.Y. 2001) ("Having found, *supra*, that the C–D device was not defective, and that plaintiffs have not provided proximate causation evidence to survive summary judgment, this claim also fails."); *Perez v. Radar Realty*, 34 A.D.3d 305, 306, 824 N.Y.S.2d 87, 88–89 (1st Dept. 2006) ("While there are instances in which a design defect claim premised on strict products liability is distinguishable from a design defect claim premised on breach of the implied warranty of merchantability, no such situation is presented here.") (citation omitted).

In the instant case, Plaintiffs do not offer a distinct "ordinary purpose."  Instead, by way of attempting to distinguish *Gonzalez by Gonzalez,* they argue at length that "Plaintiffs'

25

[alternative] safety design, which would eliminate the risk of injury, a wider finger guard, in no way effects the claimed utility of the crossbow." (Pls.' Opp. at 13.)  But this argument is directed towards the underlying viability of Plaintiffs' strict liability claim, and, as explained above, Plaintiffs do not have admissible evidence to support the existence of a feasible alternative design, and accordingly that claim fails.

The Court's holding that Plaintiffs' strict liability claim is deficient reflects an assessment that Plaintiffs failed to demonstrate that the utility associated with the crossbow's ability to fire a projectile in the context of target shooting, as Mrs. Nemes did, is outweighed by the risk of personal injury.  As a result, Plaintiffs were required to show that the ordinary purpose for the Lady Raptor was different than target shooting such that the Court could then assess whether the crossbow was fit for that purpose.  Plaintiffs do not allege any distinct ordinary purpose of the Lady Raptor, and the Court does not credit their argument that it should assess the ordinary purpose of a component part separate from the product itself.

Likewise, as in *Arnold* and *Barrett*, Plaintiffs here fail to allege sufficient facts to distinguish their implied warranty and strict products liability claims.  In support of Plaintiffs' strict products liability claim, Plaintiffs alleged that the crossbow "was defective and unreasonably dangerous in its design, construction, manufacture, sale, marketing, distribution, installation and testing of the Lady Raptor FX crossbow, and/or in failing to recall, retrofit or modify said Lady Raptor FX crossbow, which was unreasonably dangerous and defective." (Compl. ¶ 25.)  In support of their implied warranty claim, Plaintiffs allege that "the defendants are guilty of breaching . . . implied warranties, including but not limited to the breach of implied warranties as to merchantability." (Compl. ¶ 26.)  Plaintiffs' opposition memorandum further illustrates that the gravamen of these theories of liability is essentially the same.  (*Compare* Pls.'

26

Opp. at 14 (arguing that the crossbow was not merchantable because it was not "designed in such a manner that the thumb or fingers are prevented from coming into contact with the bowstring and injuring the shooter.") *with* Pls.' Opp. at 6 (positing that "[t]o show a defective design, in the case at bar, the Plaintiffs need only show that it is feasible to design a functional crossbow barrier guard . . . which would have prevented Mrs. Nemes' thumb from going above the flight track into the crossbow string.")).

Accordingly, Plaintiffs fail to carry their burden in demonstrating that the crossbow was not reasonably fit for its ordinary purpose, and the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' implied warranty of merchantability claim.

## V.    Abandoned Express Warranty Claim

Plaintiffs abandoned their breach of express warranty.  Defendants moved for summary judgment on Plaintiffs' breach of express warranty claim, noting that Plaintiffs "have not identified a single statement as the basis for purchasing the Barnett Lady Raptor FX crossbow." (Defs.' Mem. at 5.).  Plaintiffs did not acknowledge or address this argument in opposition to the motion and refer only to design defect and breach of implied warranty claims.  *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Russell v. N.Y. Univ.*, No. 15 Civ. 2185, 2017 WL 3049534, at *34 (S.D.N.Y. July 17, 2017) (collecting cases where courts, on summary judgment, deem claim abandoned based on plaintiff's failure to address the claim).  Accordingly, summary judgment is granted to the extent the complaint alleges a claim predicated on a breach of express warranty.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 69, terminate

this action, and enter judgment for the Defendants accordingly.


Dated:    February 23, 2021                            SO ORDERED:
          White Plains, New York

                                        _____

                                               NELSON S. ROMÁN
                                            United States District Judge

28